**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY, and
GEICO CASUALTY CO.,

                Plaintiffs,

     -v-

MIRACLE HEALTH SERVICES INC, CORAL
BLUE MEDICAL CENTER LLC, MAGIC
HEALING INC, CARING WITH LOVE CENTER
INC., LIZI ROCHE, L.M.T., OMAR I. MARTIN,
OSCAR M. CASTILLO MARTIN, EDUARDO
RIVERA LLANES, WILLIAN D. RODRIGUEZ
REYES, YOLANDA BURGOS ZARATE, M.D.,
EDUARDO S. MENDEZ, M.D., LESLY SILVA,
M.D., MAHA NAIM, M.D., and RAVISHANKER
V. SUJAKUMAR, D.O.,

                Defendants.

_____

**Jury Trial Demand**

## COMPLAINT

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company, and GEICO Casualty Co. (collectively, "GEICO" or "Plaintiffs") hereby

allege as follows:

1.     This action seeks to recover more than $5,000,000.00 that the respective

Defendants wrongfully obtained from GEICO by submitting thousands of fraudulent and unlawful

no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants

Miracle Health Services Inc ("Miracle Health"), Coral Blue Medical Center LLC ("Coral Blue"),

Magic Healing Inc ("Magic Healing"), and Caring With Love Center Inc ("Caring With Love") (collectively, the "Clinic Defendants"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including putative initial examinations, follow-up examinations, extracorporeal shockwave therapy ("ESWT"), and physical therapy services (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.      In addition, GEICO seeks declarations that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent, and unlawful PIP claims that the respective Defendants have submitted through the Clinic Defendants because:

(i)      at all relevant times, the Defendants operated in violation of Florida law, including the Florida Health Care Clinic Act, Fla. Stat. §§ 400.990 et seq. (the "Clinic Act"), Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"), and Florida's Physical Therapy Practice Act, Flat. Stat. §§ 486.011-486.172 (the "Physical Therapy Act");

(ii)     the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services were never legitimately provided in the first instance;

(iv)     in many cases, the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to fraudulently inflate the charges submitted to GEICO;

(v)      in many cases, the Fraudulent Services were performed by massage therapists, and Florida law prohibits PIP insurance reimbursement for massage or for services provided by massage therapists;

(vi)     in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were performed by individuals who lacked the requisite licenses to perform the services; and

2

(vii)   in many cases, the billing submitted through the Clinic Defendants misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services and was submitted in violation of the billing requirements set forth in the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

3.      The Defendants – at all relevant times – have known that the PIP insurance charges they submitted to GEICO were fraudulent, unlawful, and ineligible for reimbursement for the reasons set forth herein.

4.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the Clinic Defendants.

5.      The charts attached as Exhibits "1" - "4" set forth large, representative samples of the fraudulent claims that have been identified to date that the respective Defendants have submitted to GEICO.

6.      The Defendants' interrelated fraudulent and unlawful schemes began no later than 2020 and have continued uninterrupted since that time. As a result of the Defendants' fraudulent and unlawful schemes, GEICO has incurred damages of more than $5,000,000.00.

## I.     **Plaintiffs**

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "GEICO") are Nebraska corporations with their principal places of business in Bethesda, Maryland. GEICO is authorized to conduct business and issue automobile insurance policies in Florida.

## II.    **Defendants**

8.      Defendant Miracle Health is a Florida corporation with its principal place of business in Miami, Florida. Miracle Health was incorporated in Florida on or about June 1, 2009, and operated a Florida health care clinic that was used as a vehicle to submit fraudulent and

3

unlawful PIP insurance billing to GEICO and other insurers.

9.      Defendant Lizi Roche ("Roche") resides in and is a citizen of Florida. Roche was licensed to practice massage therapy in Florida on or about March 5, 2018. At all relevant times, Roche owned and controlled Miracle Health and used Miracle Health as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

10.     Defendant Coral Blue is a Florida limited liability company with its principal place of business in Miami, Florida. Coral Blue was organized in Florida on or about June 12, 2018, and operated a Florida health care clinic that was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

11.     Defendant Omar I. Martin ("Martin") resides in and is a citizen of Florida. Martin owned, controlled, and was the member of Coral Blue between August 2018 and June 2025, and used Coral Blue as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

12.     Defendant Oscar M. Castillo Martin ("Castillo Martin") resides in and is a citizen of Florida. Castillo Martin owned, controlled, and was the member of Coral Blue from June 2025 to the present, and used Coral Blue as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

13.     Defendant Magic Healing is a Florida corporation with its principal place of business in Miami, Florida. Magic Healing was incorporated in Florida on or about August 20, 2018, and operated a Florida health care clinic that was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

14.     Defendant Eduardo Rivera Llanes ("Llanes") resides in and is a citizen of Florida. Llanes owned and controlled Magic Healing from May 2022 to the present and used Magic

4

Healing as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

15.     Defendant Caring With Love is a Florida corporation with its principal place of business in Miami, Florida. Caring With Love was incorporated in Florida on or about March 16, 2016, and operated a Florida health care clinic that was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

16.     Defendant Willian D. Rodriguez Reyes ("Reyes") resides in and is a citizen of Florida. At all relevant times, Reyes owned and controlled Caring With Love and used Caring With Love as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

17.     Defendant Yolanda Burgos Zarate, M.D. ("Zarate") resides in and is a citizen of Florida. Zarate was licensed to practice medicine in Florida on or about May 9, 1994. Zarate falsely purported to serve as medical director at Miracle Health between July 2023 and October 2024; falsely purported to serve as medical director at Coral Blue between March 2023 and January 2024; falsely purported to serve as medical director at Magic Healing between March 2023 and March 2025; falsely purported to serve as medical director at Caring With Love from January 2025 to the present; and purported to personally perform or directly supervise many of the Fraudulent Services at Miracle Health and Magic Healing.

18.     Defendant Eduardo S. Mendez, M.D. ("Mendez") resides in and is a citizen of Florida. Mendez was licensed to practice medicine in Florida on or about October 31, 2001. Mendez falsely purported to serve as medical director at Miracle Health between June 2019 and July 2023 and purported to personally perform or directly supervise many of the Fraudulent Services at Miracle Health.

19.     In February 2003, Mendez was convicted of conspiracy to commit Medicare fraud in the United States District Court for the Southern District of Florida and thereafter was subjected to professional discipline by the Florida State Board of Medicine. Upon information and belief, Mendez's criminal history and history of professional discipline made it difficult for him to obtain legitimate employment as a physician and contributed to his motive to participate in the fraudulent and unlawful scheme at Miracle Health.

20.     Defendant Lesly Silva, M.D. ("Silva") resides in and is a citizen of Florida. Silva was licensed to practice medicine in Florida on or about December 17, 2019. Silva falsely purported to serve as medical director at Miracle Health from October 2024 to the present.

21.     Defendant Ravishanker V. Sujakumar, D.O. ("Sujakumar") resides in and is a citizen of Florida. Sujakumar was licensed to practice medicine in Florida on or about September 1, 2016. Sujakumar falsely purported to serve as medical director at Coral Blue from January 2024 to the present.

22.     Defendant Maha Naim, M.D. ("Naim") resides in and is a citizen of Florida. Naim was licensed to practice medicine in Florida on or about September 25, 2018. Naim falsely purported to serve as medical director at Coral Blue between June 2019 and July 2023. Naim also purportedly served as the medical director at Magic Healing between October 2022 and March 2023.

**JURISDICTION AND VENUE**

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and the action is between citizens of different states.

24.     The Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims

brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

25.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

26.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.     Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

27.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to insureds.

28.     Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

29.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided.

30.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state

and federal law related to the provision of medical services or treatment."

31.     Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

32.     Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

33.     Pursuant to the Clinic Act, every clinic operating in Florida must – among other things – be licensed by the Florida Agency for Health Care Administration ("AHCA"), and appoint a physician or other qualified health care practitioner as medical director or clinic director, who must agree in writing to accept legal responsibility for certain enumerated activities on behalf of the clinic.

34.     Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action."

35.     In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

36.     Moreover, a clinic medical director must "review any patient referral contracts or agreements executed by the clinic."

37. In addition, pursuant to the Clinic Act, a clinic medical director must "[s]erve as the clinic records owner as defined in [Fla. Stat. §] 456.057." Pursuant to Fla. Stat. § 456.057(10), "[a]ll records owners shall develop and implement policies, standards, and procedures to protect the confidentiality and security of the medical record," and all "[e]mployees of records owners shall be trained in these policies, standards, and procedures."

38. Furthermore, pursuant to the Clinic Act, no Florida health care clinic may operate without the legitimate, day-to-day supervision of a physician-medical director.

39. Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

40. Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

41. Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from patients with PIP insurance.

42. Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

43. Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP

9

Benefits for medically necessary services. At the same time, a health care services provider, including a clinic licensed under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

44.     Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a)     in accordance with generally accepted standards of medical practice;

(b)     clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c)     not primarily for the convenience of the patient, physician, or other health care provider.

45.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy and for services performed by massage therapists.

46.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for any services provided by massage therapists.

47.     Pursuant to the Physical Therapy Act: (i) massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy; and (ii) unlicensed and unsupervised individuals may not practice physical therapy or hold themselves out as being able to practice physical therapy.

48.     Pursuant to the Physical Therapy Act and the No-Fault Law, insurers such as GEICO are not required to pay for any services performed by massage therapists, or for physical therapy services that are unlawfully performed by unlicensed and unsupervised individuals.

49.     Pursuant to the No-Fault Law, insurers such as GEICO also are not required to pay

10

PIP Benefits:

(i)      for any service or treatment that is "upcoded", meaning that it is billed using a billing code that would result in payment greater in amount than would be paid using a billing code that accurately describes the services performed;

(ii)      to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)      with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

50.      The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes.

51.      The instructions promulgated by CMS for the completion of HCFA-1500 forms require – among other things – that all HCFA-1500 forms set forth, in Box 31, the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

52.      To "directly supervise" a service, a supervising health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

53.      Pursuant to the No-Fault Law, insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual licensed health care practitioners who performed or directly supervised the underlying services.

11

## II.      The Defendants' Interrelated Fraudulent and Unlawful Schemes

54.      Beginning in at least 2020, and continuing through the present day, the Defendants conceived and implemented interrelated fraudulent and unlawful schemes in which they billed GEICO and other Florida automobile insurers millions of dollars for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

55.      In the claims identified in Exhibits "1" - "4", almost none of the Insureds whom the respective Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor accidents they experienced.

56.      Even so, in the claims identified in Exhibits "1" - "4", the respective Defendants purported to subject almost every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to provide medically necessary treatment to the Insureds.

57.      The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1" - "4" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the absence of any significant continuing medical problems arising from any actual automobile accidents.

58.      Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

59.      No legitimate physician, health care practitioner, or clinic would permit the fraudulent treatment and billing protocols described below to proceed under their auspices.

12

60. The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because they sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**A. The Fraudulent and Unlawful Charges for Initial Examinations at the Clinic Defendants**

61. As an initial step in the Defendants' fraudulent treatment and billing protocols, the Defendants purported to provide many Insureds with initial examinations.

62. In the claims for initial examinations that are identified in Exhibit "1", Miracle Health, Roche, Mendez, Zarate, and Silva billed GEICO for the purported initial examinations using CPT code 99204, typically resulting in a charge of $400.00 for each initial examination they purported to provide.

63. In the claims for initial examinations that are identified in Exhibit "2", Coral Blue, Martin, and Naim billed GEICO for the purported initial examinations using CPT code 99204, typically resulting in a charge of $500.00 for each initial examination they purported to provide.

64. In the claims for initial examinations that are identified in Exhibit "3", Magic Healing, Llanes, Naim, and Zarate billed GEICO for the purported initial examinations using CPT code 99204, typically resulting in a charge of $400.00 for each initial examination they purported to provide.

65. In the claims for initial examinations that are identified in Exhibit "4", Caring With Love, Reyes, and Zarate billed GEICO for the purported initial examinations using CPT codes 99203 and 99204, typically resulting in charges of either $300.00 or $400.00 for each initial examination they purported to provide.

66. In the claims for initial examinations identified in Exhibits "1" - "4", the charges for the initial examinations were fraudulent in that they misrepresented the Clinic Defendants'

13

eligibility to collect PIP Benefits in the first instance.

67. In fact, and as set forth herein, none of the Clinic Defendants was ever eligible to collect PIP Benefits, inasmuch as the clinics were unlawfully operated in violation of Florida law.

68. As set forth herein, the charges for the initial examinations identified in Exhibits "1" - "4" were also fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**(i)     The Misrepresentations Regarding the Severity of the Insureds' Presenting Problems During the Purported Initial Examinations**

69. As set forth herein, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of CPT codes.

70. The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

71. Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the patient presented with problems of moderate severity.

72. The CPT Assistant provides various clinical examples of moderate severity presenting problems that would support the use of CPT code 99203 to bill for an initial patient examination, including:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of a 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of a 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v) Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

73. Accordingly, pursuant to the CPT Assistant, the moderate severity presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

74. Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination typically represents that the patient presented with problems of moderate to high severity.

75. The CPT Assistant provides the following clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination, including:

(i) Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii) Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii) Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv) Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v) Initial office visit for a 7-year-old female with juvenile diabetes mellitus, who is new to the area, and has been previously hospitalized on three separate occasions. (Pediatrics)

(vi) Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii) Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

76. Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

77. By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" - "4" had any presenting problems at all as the result of their typically minor automobile accidents, the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

78. For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibits "1" - "4" either had no presenting problems at all as the result of their minor automobile accidents, or else had problems of minimal severity, in most of the claims identified in Exhibits "1" - "4", the Insureds did not seek treatment at any hospital as the result of their accidents.

79. To the limited extent that the Insureds in the claims identified in Exhibits "1" - "4" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis and then were discharged with nothing more serious than a minor soft tissue injury diagnosis such as a sprain or strain.

80. Furthermore, in most of the claims identified in Exhibits "1" - "4", the contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents, or injured at all.

81. Even so, in the claims for initial examinations identified in Exhibits "1" - "4", the respective Defendants routinely billed for their putative initial examinations using CPT codes 99203 and 99204, and thereby falsely represented that the Insureds presented with problems of moderate severity and moderate to high severity, respectively.

82. For example:

16

(i)     On February 20, 2020, an Insured named IC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision and that IC's vehicle was drivable following the accident. The police report further indicated that IC was not injured. In keeping with the fact that IC was not seriously injured, IC did not visit any hospital emergency room following the accident. To the extent that IC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of IC on March 2, 2020, Caring With Love and Reyes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ii)    On June 24, 2020, an Insured named BP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision, and that BP's vehicle was drivable following the accident. The police report further indicated that BP was not injured. In keeping with the fact that BP was not seriously injured, BP did not visit any hospital emergency room following the accident. To the extent that BP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of BP on June 26, 2020, Coral Blue, Martin, and Naim billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)   On February 9, 2021, an Insured named EP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision and that EP's vehicle was drivable following the accident. The police report further indicated that EP was not injured. In keeping with the fact that EP was not seriously injured, EP did not visit any hospital emergency room following the accident. To the extent that EP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of EP on February 16, 2021, Caring With Love and Reyes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)    On June 8, 2021, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed collision, and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MB on June 14, 2021, Coral Blue, Martin, and Naim billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate

to high severity.

(v)   On October 10, 2021, an Insured named GF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision, and that GF's vehicle was drivable following the accident. The police report further indicated that GF was not injured. In keeping with the fact that GF was not seriously injured, GF did not visit any hospital emergency room following the accident. To the extent that GF experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of GF on October 19, 2021, Coral Blue, Martin, and Naim billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)  On June 15, 2022, an Insured named CC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, collision, and that CC's vehicle was drivable following the accident. The police report further indicated that CC was not injured. In keeping with the fact that CC was not seriously injured, CC did not visit any hospital emergency room following the accident. To the extent that CC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of CC on June 21, 2022, Coral Blue, Martin, and Naim billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii) On July 12, 2022, an Insured named JF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision, and that JF's vehicle was drivable following the accident. The police report further indicated that JF was not injured. In keeping with the fact that JF was not seriously injured, JF did not visit any hospital emergency room following the accident. To the extent that JF experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JF on July 26, 2022, Coral Blue, Martin, and Naim billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii) On October 6, 2022, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JR on October 10, 2022, Magic Healing, Llanes, and Naim billed

18

GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)    On October 13, 2022, an Insured named JV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision and that JV's vehicle was drivable following the accident. The police report further indicated that JV was not injured. In keeping with the fact that JV was not seriously injured, JV did not visit any hospital emergency room following the accident. To the extent that JV experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JV on October 14, 2022, Magic Healing, Llanes, and Naim billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x)    On December 8, 2022, two Insureds named JO and SQ were involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision and that their vehicle was drivable following the accident. The police report further indicated that neither JO nor SQ were injured. In keeping with the fact that neither JO nor SQ were seriously injured, neither visited any hospital emergency room following the accident. To the extent that JO and SQ experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following purported initial examinations of JO and SQ on December 13, 2022, Caring With Love and Reyes billed GEICO for the initial examinations using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xi)    On December 27, 2022, an Insured named OD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision, and that OD's vehicle was drivable following the accident. The police report further indicated that OD was not injured. In keeping with the fact that OD was not seriously injured, OD did not visit any hospital emergency room following the accident. To the extent that OD experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of OD on January 5, 2023, Miracle Health, Roche, and Mendez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xii)    On January 28, 2023, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at

19

all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MC on January 31, 2023, Caring With Love, Reyes, and Natalie Gardiner, M.D.  ("Gardiner") billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiii)   On March 7, 2023, two Insureds named JM and GD were involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision and that their vehicle was drivable following the accident. The police report further indicated that neither JM nor GD were injured. In keeping with the fact that JM and GD were not seriously injured, neither JM nor GD visited any hospital emergency room following the accident. To the extent that JM and GD experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following purported initial examinations of JM and GD on March 8, 2023, Magic Healing, Llanes, and Zarate billed GEICO for the initial examinations using CPT code 99204, and thereby falsely represented that the initial examinations involved presenting problems of moderate to high severity.

(xiv)   On March 16, 2023, an Insured named LG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision and that LG's vehicle was drivable following the accident. The police report further indicated that LG was not injured. In keeping with the fact that LG was not seriously injured, LG did not visit any hospital emergency room following the accident. To the extent that LG experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of LG on March 17, 2023, Magic Healing, Llanes, and Zarate billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv)   On May 31, 2023, an Insured named MV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision and that MV's vehicle was drivable following the accident. The police report further indicated that MV was not injured. In keeping with the fact that MV was not seriously injured, MV did not visit any hospital emergency room following the accident. To the extent that MV experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MV on June 1, 2023, Magic Healing, Llanes, and Zarate billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvi)   On July 1, 2023, an Insured named IO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision, and that IO's vehicle was drivable following the accident. The police report further indicated that IO was not injured. In keeping with the fact that IO was not seriously

20

injured, IO did not visit any hospital emergency room following the accident. To the extent that IO experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of IO on July 5, 2023, Miracle Health, Roche, and Zarate billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvii)   On October 10, 2023, an Insured named NQ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision and that NQ's vehicle was drivable following the accident. The police report further indicated that NQ was not injured. In keeping with the fact that NQ was not seriously injured, NQ did not visit any hospital emergency room following the accident. To the extent that NQ experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of NQ on October 16, 2023, Magic Healing, Llanes, and Zarate billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xviii)  On April 16, 2024, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. To the extent that JR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of JR on April 19, 2024, Miracle Health, Roche, and Zarate  billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xix)    On March 28, 2025, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of AM on March 31, 2025, Caring With Love, Reyes, and Zarate billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xx)     On April 29, 2025, an Insured named LC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision and that LC's vehicle was drivable following the accident. The police

report further indicated that LC was not injured. In keeping with the fact that LC was not seriously injured, LC did not visit any hospital emergency room following the accident. To the extent that LC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of LC on May 6, 2025, Caring With Love, Reyes, and Zarate billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

83.     These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "4", the respective Defendants routinely falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of minimal severity or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)     Misrepresentations Regarding the Amount of Time Spent on the Purported Initial Examinations**

84.     What is more, in the claims identified in Exhibits "1" - "4", the charges for the initial examinations under CPT codes 99203 and 99204 misrepresented and exaggerated the amount of time that the examining health care practitioners spent performing the examinations.

85.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the physician or other health care practitioner who performed the underlying examination spent at least 30 minutes performing the examination.

86.     Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the physician or other health care practitioner who performed the underlying examination spent at least 45 minutes performing the examination.

87.     As set forth in Exhibits "1" - "4", the respective Defendants typically billed the purported initial-up examinations through Miracle Health, Coral Blue, Magic Healing and Caring With Love to GEICO under CPT codes 99203 and 99204, and thereby represented that the practitioners who purported to conduct the examinations spent at least 30-45 minutes performing the examinations.

88.     In fact, in the initial examinations identified in Exhibits "1" - "4", the practitioners who purported to perform the initial examinations on behalf of the Clinic Defendants never spent more than 15 minutes when conducting the examinations, much less 30-45 minutes.

89.     In keeping with the fact that the initial examinations in the claims identified in Exhibits "1" - "4" did not involve more than 15 minutes of time to perform, the examining practitioners at the Clinic Defendants used templated forms in purporting to conduct the examinations.

90.     All that was required to complete the forms was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

91.     These interviews and examinations did not require any examining health care practitioners associated with the Clinic Defendants to spend more than 15 minutes performing the putative initial examinations.

92.     Moreover, the purported initial examinations in the claims identified in Exhibits "1" - "4" were not legitimately performed at all, inasmuch as the outcomes of the putative examinations were pre-determined to result in false soft tissue injury diagnoses and medically unnecessary treatment recommendations, regardless of the Insureds' actual individual circumstances and presentation. These false and predetermined examinations did not require the

examining health care practitioners to spend more than 15 minutes performing the supposed examinations.

93.     In the claims for initial examinations that are identified in Exhibits "1" - "4", the Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations that take less time to perform.

**(iii)    Misrepresentations Regarding the Extent of the Medical Decision-Making During the Purported Initial Examinations**

94.     Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination – namely: (i) straightforward medical decision-making; (ii) low complexity medical decision-making; (iii) moderate complexity medical decision-making; and (iv) high complexity medical decision-making.

95.     Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or management options to be considered; (ii) the amount and/or complexity of the medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

96.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or other practitioner who performed the examination engaged in legitimate "low complexity" medical decision-making in connection with the examination.

97.     For an initial patient examination to legitimately entail "low complexity" medical

24

decision-making, the examination typically must, among other things, involve: (i) the review and analysis of some of the patient's medical records or information regarding the patient's history obtained from an independent historian; and (ii) at least some real risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

98.     Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or other practitioner who performed the examination engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

99.     For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must, among other things, involve: (i) the chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) the review and analysis of a larger amount of the patient's medical records/history than would be required to satisfy "low complexity" medical decision-making; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

100.     As set forth above and in Exhibits "1" - "4", the respective Defendants billed GEICO for almost all of their putative initial patient examinations of the Insureds using CPT codes 99203 and 99204, and thereby falsely represented that the examining practitioners engaged in genuine low complexity medical decision-making or genuine moderate complexity medical decision-making, respectively, in connection with the initial examinations.

101.     In fact, and to the extent that the Insureds in the claims identified in Exhibits "1" - "4" had any presenting problems at all as the result of their typically minor automobile accidents,

25

the problems almost always were minor soft tissue injuries such as sprains and strains.

102. The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate low or moderate complexity medical decision-making.

103. First, in the Defendants' claims for initial examinations identified in Exhibits "1" - "4", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

104. When the Insureds in the claims identified in Exhibits "1" - "4" presented to the respective Clinic Defendants for "treatment", they typically did not arrive with any significant medical records.

105. Furthermore, prior to the initial examinations, the Defendants and the examining health care practitioners who worked at their direction typically did not request any significant medical records from any other providers regarding the Insureds, nor did they provide, review, or analyze any complex diagnostic tests or other information in connection with the examinations.

106. Second, in the Defendants' claims for initial examinations identified in Exhibits "1" - "4", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft tissue complaints, to the extent that the Insureds had any complaints arising from their minor automobile accidents at all.

107. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided during the initial examinations, to the extent that any such diagnostic procedures or treatment options were provided in the first instance.

108. Rather, to the extent that the initial examinations were conducted in the first instance, the examining practitioners – at the direction of the Defendants – provided substantially

26

similar, pre-determined, and false series of soft tissue injury "diagnoses" for each Insured and prescribed a substantially similar course of medically unnecessary treatment for each Insured.

109. Specifically, in almost every instance in the claims identified in Exhibits "1" - "4", during the initial examinations, the Insureds did not report any serious continuing medical problems that legitimately could be traced to an underlying automobile accident.

110. Even so, the examining practitioners – at the direction of the Defendants – prepared initial examination reports in which they provided false, boilerplate sprain/strain and similar soft tissue "diagnoses" to almost every Insured.

111. For example:

(i) On February 20, 2020, an Insured named IC was involved in an automobile accident. The contemporaneous police report indicated that IC was not seriously injured during the accident. In keeping with the fact that IC was not seriously injured, IC did not visit any hospital emergency room following the accident. On March 2, 2020, IC purportedly received an initial examination at Caring With Love. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of Caring With Love and Reyes – provided IC with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither IC's presenting problems, nor the treatment plan provided to IC, presented any risk of significant complications, morbidity, or mortality. To the contrary, IC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to IC by Caring With Love and Reyes consisted of medically unnecessary physical therapy treatment, which did not pose any risk to IC if properly administered. Even so, Caring With Love and Reyes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination entailed legitimate, low complexity medical decision-making.

(ii) On February 9, 2021, and Insured named EP was involved in an automobile accident. The contemporaneous police report indicated that EP was not seriously injured during the accident. In keeping with the fact that EP was not seriously injured, EP did not visit any hospital emergency room following the accident. On February 16, 2021, EP purportedly received an initial examination at Caring With Love. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in

connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of Caring With Love and Reyes – provided EP with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither EP's presenting problems, nor the treatment plan provided to EP, presented any risk of significant complications, morbidity, or mortality. To the contrary, EP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to EP by Caring With Love and Reyes consisted of medically unnecessary physical therapy treatment, which did not pose any risk to EP if properly administered. Even so, Caring With Love and Reyes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination entailed legitimate, low complexity medical decision-making.

(iii)     On October 6, 2022, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that JR was not seriously injured during the accident. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. On October 10, 2022, JR purportedly received an initial examination at Magic Healing. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of Magic Healing, Llanes, and Naim – provided JR with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR, presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to JR by Magic Healing, Llanes, and Naim consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JR if properly administered. Even so, Magic Healing, Llanes, and Naim billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination entailed legitimate, moderate complexity medical decision-making.

(iv)     On October 13, 2022, an Insured named JV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision, and that JV's vehicle was drivable following the accident. The police report further indicated that JV was not injured. In keeping with the fact that JV was not seriously injured, JV did not visit any hospital emergency room following the accident. On October 14, 2022, JV purportedly received an initial examination at Magic Healing. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection

with the examination. Instead, the examining practitioner – at the direction of Magic Healing, Llanes, and Naim – provided JV with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither JV's presenting problems, nor the treatment plan provided to JV, presented any risk of significant complications, morbidity, or mortality. To the contrary, JV did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to JV by Magic Healing, Llanes, and Naim consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JV if properly administered. Even so, Magic Healing, Llanes, and Naim billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination entailed legitimate, moderate complexity medical decision-making.

(v)     On December 8, 2022, two Insureds named JO and SQ were involved in an automobile accident. The contemporaneous police report indicated that neither JO nor SQ were injured. In keeping with the fact that JO and SQ were not seriously injured, JO and SQ did not visit any hospital emergency room following the accident. On December 13, 2022, JO and SQ purportedly received initial examinations at Magic Healing. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examinations. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examinations. Instead, the examining practitioner – at the direction of Magic Healing, Llanes, and Naim – provided JO and SQ with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither JO and SQ's presenting problems, nor the treatment plan provided to JO and SQ, presented any risk of significant complications, morbidity, or mortality. To the contrary, JO and SQ did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to JO and SQ by Magic Healing, Llanes, and Naim consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JO and SQ if properly administered. Even so, Magic Healing, Llanes, and Naim billed GEICO for the initial examinations using CPT code 99204, and thereby falsely represented that the examinations entailed legitimate, moderate complexity medical decision-making.

(vi)    On December 27, 2022, an Insured named OD was involved in an automobile accident. The contemporaneous police report indicated that OD was not seriously injured during the accident. In keeping with the fact that OD was not seriously injured, OD did not visit any hospital emergency room following the accident. On January 5, 2023, OD purportedly received an initial examination at Miracle Health. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of Miracle

Health, Roche, and Mendez – provided OD with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither OD's presenting problems, nor the treatment plan provided to OD, presented any risk of significant complications, morbidity, or mortality. To the contrary, OD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to OD by Miracle Health, Roche, and Mendez consisted of medically unnecessary physical therapy treatment, which did not pose any risk to OD if properly administered. Even so, Miracle Health, Roche, and Mendez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination entailed legitimate, moderate complexity medical decision-making.

(vii)   On January 28, 2023, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that MC was not seriously injured during the accident. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. On January 31, 2023, MC purportedly received an initial examination at Caring With Love. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of Caring With Love and Reyes – provided MC with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither MC's presenting problems, nor the treatment plan provided to MC, presented any risk of significant complications, morbidity, or mortality. To the contrary, MC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to MC by Caring With Love and Reyes consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MC if properly administered. Even so, Caring With Love and Reyes billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination entailed legitimate, low complexity medical decision-making.

(viii)  On March 7, 2023, two Insureds named JM and GD were involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision, and that their vehicle was drivable following the accident. The police report further indicated that neither JM nor GD were injured. In keeping with the fact that JM and GD were not seriously injured, JM and GD did not visit any hospital emergency room following the accident. On March 8, 2023, JM and GD purportedly received initial examinations at Magic Healing. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examinations. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examinations. Instead, the examining practitioner – at the direction of Magic Healing, Llanes, and Zarate –

provided JM and GD with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither JM nor GD's presenting problems, nor the treatment plan provided to JM and GD, presented any risk of significant complications, morbidity, or mortality. To the contrary, JM and GD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to JM and GD by Magic Healing, Llanes, and Zarate consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JM and GD if properly administered. Even so, Magic Healing, Llanes, and Zarate billed GEICO for the initial examinations using CPT code 99204, and thereby falsely represented that the examinations entailed legitimate, moderate complexity medical decision-making.

(ix)     On March 16, 2023, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision, and that LS's vehicle was drivable following the accident. The police report further indicated that LS was not injured. In keeping with the fact that LS was not seriously injured, LS did not visit any hospital emergency room following the accident. On March 17, 2023, LS purportedly received an initial examination at Magic Healing. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of Magic Healing, Llanes, and Zarate – provided LS with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither LS's presenting problems, nor the treatment plan provided to LS, presented any risk of significant complications, morbidity, or mortality. To the contrary, LS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to LS by Magic Healing, Llanes, and Zarate consisted of medically unnecessary physical therapy treatment, which did not pose any risk to LS if properly administered. Even so, Magic Healing, Llanes, and Zarate billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination entailed legitimate, moderate complexity medical decision-making.

(x)     On May 29, 2023, an Insured named LD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision, and that LD's vehicle was towed at LD's request, not due to property damage. The police report further indicated that LD was not injured. In keeping with the fact that LD was not seriously injured, LD did not visit any hospital emergency room following the accident. On May 31, 2023, LD purportedly received an initial examination at Miracle Health. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the

examining practitioner – at the direction of Miracle Health, Roche, and Mendez – provided LD with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither LD's presenting problems, nor the treatment plan provided to LD, presented any risk of significant complications, morbidity, or mortality. To the contrary, LD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to LD by Miracle Health, Roche, and Mendez consisted of medically unnecessary physical therapy treatment, which did not pose any risk to LD if properly administered. Even so, Miracle Health, Roche, and Mendez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination entailed legitimate, moderate complexity medical decision-making.

(xi)     On May 31, 2023, an Insured named MV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision, and that MV's vehicle was drivable following the accident. The police report further indicated that MV was not injured. In keeping with the fact that MV was not seriously injured, MV did not visit any hospital emergency room following the accident. On June 1, 2023, MV purportedly received an initial examination at Magic Healing. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of Magic Healing, Llanes, and Zarate – provided MV with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither MV's presenting problems, nor the treatment plan provided to MV, presented any risk of significant complications, morbidity, or mortality. To the contrary, MV did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to MV by Magic Healing, Llanes, and Zarate consisted of medically unnecessary physical therapy treatment, which did not pose any risk to MV if properly administered. Even so, Magic Healing, Llanes, and Zarate billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination entailed legitimate, moderate complexity medical decision-making.

(xii)    On July 1, 2023, an Insured named IO was involved in an automobile accident. The contemporaneous police report indicated that IO was not seriously injured during the accident. In keeping with the fact that IO was not seriously injured, IO did not visit any hospital emergency room following the accident. On July 5, 2023, IO purportedly received an initial examination at Miracle Health. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of Miracle Health, Roche, and Mendez –

32

provided IO with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither IO's presenting problems, nor the treatment plan provided to IO, presented any risk of significant complications, morbidity, or mortality. To the contrary, IO did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to IO by Miracle Health, Roche, and Mendez consisted of medically unnecessary physical therapy treatment, which did not pose any risk to IO if properly administered. Even so, Miracle Health, Roche, and Mendez billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination entailed legitimate, moderate complexity medical decision-making.

(xiii)   On October 10, 2023, an Insured named NG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a minor collision, and that NG's vehicle was drivable following the accident. The police report further indicated that NG was not injured. In keeping with the fact that NG was not seriously injured, NG did not visit any hospital emergency room following the accident. On October 16, 2023, NG purportedly received an initial examination at Magic Healing. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of Magic Healing, Llanes, and Zarate – provided NG with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither NG's presenting problems, nor the treatment plan provided to NG, presented any risk of significant complications, morbidity, or mortality. To the contrary, NG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to NG by Magic Healing, Llanes, and Zarate consisted of medically unnecessary physical therapy treatment, which did not pose any risk to NG if properly administered. Even so, Magic Healing, Llanes, and Zarate billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination entailed legitimate, moderate complexity medical decision-making.

(xiv)   On April 16, 2024, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, minor collision, and that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured. In keeping with the fact that JR was not seriously injured, JR did not visit any hospital emergency room following the accident. On April 19, 2024, JR purportedly received an initial examination at Miracle Health. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of Miracle Health, Roche, and Zarate – provided JR with

substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR, presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to JR by Miracle Health, Roche, and Zarate consisted of medically unnecessary physical therapy treatment, which did not pose any risk to JR if properly administered. Even so, Miracle Health, Roche, and Zarate billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination entailed legitimate, moderate complexity medical decision-making.

(xv)    On April 29, 2025, an Insured named LC was involved in an automobile accident. The contemporaneous police report indicated that LC was not seriously injured during the accident. In keeping with the fact that LC was not seriously injured, LC did not visit any hospital emergency room following the accident. On May 6, 2025, LC purportedly received an initial examination at Caring With Love. The examining practitioner did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the examining practitioner did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the examining practitioner – at the direction of Caring With Love, Reyes, and Zarate – provided LC with substantially the same false list of soft tissue injury "diagnoses" that they provided almost every other Insured. Furthermore, neither LC's presenting problems, nor the treatment plan provided to LC, presented any risk of significant complications, morbidity, or mortality. To the contrary, LC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided to LC by Caring With Love, Reyes, and Zarate consisted of medically unnecessary physical therapy treatment, which did not pose any risk to LC if properly administered. Even so, Caring With Love, Reyes, and Zarate billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the examination entailed legitimate, moderate complexity medical decision-making.

112.    These are only representative examples. In the claims identified in Exhibits "1" - "4", the Defendants routinely falsely represented that the purported examinations involved legitimate low or moderate complexity decision-making, when, in fact, they did not involve any legitimate medical decision-making at all.

113.    In a legitimate clinical setting, when a patient presents with a soft tissue injury such as a sprain or strain arising from an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body

34

part.

114. It is generally inappropriate to begin administering physical therapy to a patient with a soft tissue injury in the immediate aftermath of the injury, before the patient has first tried a more conservative course of rest, ice, compression, and – if applicable – elevation of the affected body part.

115. Even so, in the claims identified in Exhibits "1" - "4", the respective Defendants routinely caused Insureds to immediately begin a course of physical therapy, often within days of their accidents, before the Insureds had first tried a more conservative course of treatment.

116. The Defendants routinely caused Insureds to immediately begin a course of physical therapy within days of their accidents, or even on the same day of their accidents, because their putative initial examinations involved no legitimate medical decision-making whatsoever and had pre-determined outcomes.

117. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

118. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

119. As set forth herein, in the claims identified in Exhibits "1" - "4", almost all of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents.

120. It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" - "4" would suffer substantially similar injuries as the result of their accidents or require a substantially similar course of treatment.

121. It is even more improbable – to the point of impossibility – that this kind of pattern

35

would recur with great frequency within the cohort of patients treating at individual health care clinics such as the Clinic Defendants, with numerous instances in which two or more patients who had been involved in the same accident supposedly presented with substantially similar symptoms warranting substantially similar diagnoses and treatment.

122.    Even so, in keeping with the fact that the Defendants' putative "diagnoses" were pre-determined and false, the Defendants frequently purported to provide examinations – on or about the same date – to two or more Insureds who had been involved in the same underlying accident, and at the conclusion of the examinations, caused the Insureds to be issued substantially identical, false "diagnoses" and recommended substantially identical courses of medically unnecessary "treatment" for the Insureds, despite the fact that they were differently situated.

123.    In the claims for initial examinations identified in Exhibits "1" - "4", the Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   none of the Clinic Defendants were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinics were unlawfully operated in violation of Florida Law.

**B.    The Fraudulent and Unlawful Charges for Follow-Up Examinations at the Clinic Defendants**

124.    In addition to their fraudulent initial examinations, the Defendants almost always purported to subject each of the Insureds in the claims identified in Exhibits "1" - "4" to one or

more fraudulent follow-up examinations during the course of their fraudulent and billing protocols.

125. As set forth in Exhibits "1" - "4", the Defendants then typically billed the purported follow-up examinations to GEICO through Miracle Health, Coral Blue, Magic Healing, and Caring With Love, respectively, under: (i) CPT code 99213, almost always resulting in a charge of between $131.00 and $350.00 for each putative follow-up examination; (ii) CPT code 99214, almost always resulting in a charge of between $230.00 and $350.00 for each putative follow-up examination; and (iii) CPT code 99215, almost always resulting in a charge of between $250.00 and $330.90 for each putative follow-up examination.

126. In the claims for follow-up examinations identified in Exhibits "1" - "4", the charges for the follow-up examinations were fraudulent in that they misrepresented the Clinic Defendants' eligibility to collect PIP Benefits in the first instance.

127. In fact, and as set forth herein, none of the Clinic Defendants were ever eligible to collect PIP Benefits, inasmuch as the clinics were unlawfully operated in violation of Florida law.

128. As set forth here, the Defendants' charges for the follow-up examinations identified in Exhibits "1" - "4" were also fraudulent in that they misrepresented the nature, extent, and results of the purported follow-up examinations.

**(i)** **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

129. Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represents – among other things – that the patient presented with problems of low to moderate severity at the time of the examination.

130. The CPT Assistant provides various clinical examples of low to moderate severity presenting problems that would support the use of CPT code 99213 to bill for a follow-up patient examination, including:

37

(i) Follow-up visit with a 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii) Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii) Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv) Routine, follow-up office evaluation at three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v) Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi) Quarterly follow-up visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii) Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

131. Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

132. Moreover, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represents – among other things – that the patient presented with problems of moderate to high severity at the time of the examination.

133. The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99214 to bill for a follow-up patient examination, including:

(i) Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii) Office evaluation of 28-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

38

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)    Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology / General Surgery / Internal Medicine / Family Medicine)

(viii)    Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

134.    Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

135.    Further, pursuant to the CPT Assistant, the use of CPT code 99215 to bill for a follow-up examination represents – among other things – that the patient presented with problems of high severity at the time of the examination.

136.    The CPT Assistant provides various clinical examples of high severity presenting problems that would support the use of CPT code 99215 to bill for a follow-up patient examination, including:

(i)    Office visit with 30-year-old male, established patient 3-month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly. (Family Medicine)

(ii)     Office evaluation and discussion of treatment options for a 68-year-old male with a biopsy-proven rectal carcinoma. (General Surgery)

(iii)    Office visit for restaging of an established patient with new lymphadenopathy one year post therapy for lymphoma. (Hematology/Oncology)

(iv)     Follow-up office visit for a 65-year-old male with a fever of recent onset while on outpatient antibiotic therapy for endocarditis. (Infectious Disease)

(v)      Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient. (Internal Medicine)

(vi)     Follow-up office visit for a 75-year-old patient with ALS (amyotrophic lateral sclerosis), who is no longer able to swallow. (Neurology)

(vii)    Follow-up visit, 40-year-old mother of 3, with acute rheumatoid arthritis, anatomical Stage 3, ARA function Class 3 rheumatoid arthritis, and deteriorating function. (Rheumatology)

137.    Accordingly, pursuant to the CPT Assistant, the high severity presenting problems that could support the use of CPT code 99215 to bill for a follow-up patient examination typically are problems that pose a critical threat to the patient's health, or even the patient's life.

138.    However, to the extent that the Insureds in the claims identified in Exhibits "1" - "4" suffered any injuries at all in their automobile accidents, the injuries were almost always minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

139.    Minor soft tissue injuries such as sprains and strains almost always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibits "1" - "4" presented for their putative follow-up examinations – typically weeks or months after their minor accidents – the Insureds either did not have any genuine presenting problems at all as a result of their minor automobile accidents, or else their presenting problems were minimal.

140.    Even so, in the claims for the follow-up examinations under CPT codes 99213, 99214, and 99215 identified in Exhibits "1" - "4", the Defendants represented that the Insureds

40

presented with problems of low to moderate severity, moderate to high severity, or high severity, respectively, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all at the time of the purported examinations.

141.    In the claims for follow-up examinations identified in Exhibits "1" - "4", the Defendants routinely falsely represented that the Insureds presented with problems of either low to moderate severity, moderate to high severity, or high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)    Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

142.    What is more, in the claims for follow-up examinations identified in Exhibits "1" – "4", no examining health care practitioner associated with the respective Clinic Defendants ever took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

143.    Rather, following the purported follow-up examinations at the Clinic Defendants' offices, the examining practitioners – at the direction of the respective Defendants – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and (ii) either: (a) referred the Insureds for even more medically unnecessary Fraudulent Services, despite the fact that the Insureds purportedly had already received extensive physical therapy and other Fraudulent Services that supposedly had not been successful in resolving their purported pain symptoms; or (b) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

144.    The putative "follow-up examinations" that the Defendants purported to provide the Insureds in the claims identified in Exhibits "1" - "4" were, therefore, medically useless, and

41

played no legitimate role in the treatment or care of the Insureds. This is because the putative "results" of the examinations were pre-arranged to comport with the medically unnecessary treatment plans that were pre-determined for each Insured from the moment that they presented at the Clinic Defendants' offices.

145.    In the claims for follow-up examinations identified in Exhibits "1" - "4", the respective Defendants routinely and falsely misrepresented that the follow-up examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, the follow-up examinations were neither lawfully provided nor reimbursable, because:

(i)      the putative follow-up examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)     the charges for the putative follow-up examinations misrepresented the nature, extent, and results of the examinations; and

(iii)    the Defendants were never eligible to collect PIP Benefits in connection with the putative follow-up examinations in the first instance, inasmuch as they operated in violation of Florida law.

**C.      The Fraudulent and Unlawful Charges for Physical Therapy at the Clinic Defendants**

146.    Based upon the false and predetermined "diagnoses" they provided to Insureds during the initial and follow-up examinations, the Defendants almost always purported to subject each of the Insureds in the claims identified in Exhibits "1" - "4" to extensive, medically unnecessary physical therapy.

147.    Specifically, the Defendants purportedly caused almost every Insured to receive one to three months of physical therapy treatments, typically beginning with physical therapy five times per week for the first two weeks of treatment, followed by physical therapy four to five times per week for the subsequent four weeks.

42

148.    As set forth in Exhibits "1" - "4", the Defendants then billed the purported physical therapy services to GEICO through the respective Clinic Defendants under:

(i)     CPT code 97010, for putative hot/cold pack application, typically resulting in charges ranging from $15.00 to $18.00 for each modality they purported to provide.

(ii)    CPT code 97012, for putative mechanical traction therapy, typically resulting in charges ranging from $30.50 to $38.28 for each modality they purported to provide.

(iii)   CPT code 97035, for putative neuromuscular reeducation, typically resulting in charges ranging from $10.00 to $150.72 for each modality they purported to provide.

(iv)    CPT code 97039, for putative unlisted modality treatments, typically resulting in charges ranging from $15.00 to $75.00 for each modality they purported to provide.

(v)     CPT code 97110, for putative therapeutic exercises, typically resulting in charges ranging from $61.60 to $136.80 for each modality they purported to provide.

(vi)    CPT code 97112, for putative neuromuscular reeducation, typically resulting in charges ranging from $60.70 to $143.00 for each modality they purported to provide.

(vii)   CPT code 97140, for putative manual therapy, typically resulting in charges ranging from $57.00 to $75.00 for each modality they purported to provide.

(viii)  CPT code G0283, for putative electrical stimulation, typically resulting in charges ranging from $25.00 and $35.00 for each modality they purported to provide.

149.    In the claims for physical therapy services identified in Exhibits "1" - "4", the charges for physical therapy services were fraudulent in that they misrepresented the Clinic Defendants' eligibility to collect PIP Benefits in the first instance.

150.    In fact, and as set forth above, none of the Clinic Defendants were ever eligible to collect PIP Benefits, inasmuch as the clinics were operated in violation of Florida Law.

151.    Furthermore, the purported physical therapy services that were unlawfully billed to GEICO through each of the Clinic Defendants were unlawfully performed by unlicensed and unsupervised personnel, and by massage therapists, including but not limited to Roche at Miracle

43

Health, Pedro Lopez, L.M.T. ("Lopez") at Miracle Health, Suleidy Perez Pineda, L.M.T. ("Pineda") at Miracle Health, Yanet Real, L.M.T. ("Real") at Miracle Health, Reinier De La Rosa, L.M.T. ("De La Rosa") at Coral Blue, Yusdeivy Perez Amaro, L.M.T. ("Amaro") at Coral Blue, Gabriela Leon Pacheco, L.M.T. ("Pacheco") at Magic Healing, and Omar Rodriguez, L.M.T. ("Rodriguez") at Magic Healing.

152.     The Defendants were aware of the fact that they could not lawfully recover PIP Benefits for physical therapy services performed by massage therapists or unlicensed/unsupervised.

153.     As a result, and in order to conceal the fact that massage therapists and unlicensed/unsupervised personnel performed the purported physical therapy services that were unlawfully billed through the Clinic Defendants to GEICO, the Defendants deliberately omitted any reference to the massage therapists and unlicensed individuals associated with the Clinic Defendants on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

154.     Instead, in the claims for physical therapy services identified in Exhibits "1" - "4", each of the Clinic Defendants routinely and falsely listed licensed health care practitioners other than massage therapists as the supposed providers or direct supervisors of the physical therapy services.

155.     In keeping with the fact that the physical therapy services in the claims identified in Exhibits "1" - "4" were unlawfully performed by massage therapists and unlicensed/unsupervised individuals, the services were medically unnecessary and were provided – to the extent that the services were provided at all – in a manner that did not comply with legitimate standards of care.

156.    In a legitimate clinical setting, the individual physical therapy services that are provided to a patient must be tailored to the patient's individual circumstances and presentation.

157.    There are a large number of individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

158.    However, the Defendants routinely purported to provide the same handful of physical therapy "treatments" to almost every Insured in the claims identified in Exhibits "1" - "4", on substantially the same schedule, without regard for the Insureds' individual circumstances.

159.    Specifically, the Defendants purported to provide almost every Insured in the claims identified in Exhibits "1" - "4" with one-to-three months of physical therapy services, consisting of hot/cold packs, mechanical traction therapy, ultrasound therapy, therapeutic exercises, neuromuscular reeducation, manual therapy, and electrical stimulation. This is despite the fact that the Insureds were differently situated and could not possibly all have required a substantially identical course of physical therapy treatment.

160.    In the claims for physical therapy services identified in Exhibits "1" - "4", the Defendants routinely falsely represented that the physical therapy services were lawfully provided and reimbursable, when, in fact, the were neither lawfully provided nor reimbursable, because:

(i)      the services were performed by massage therapists and unlicensed/unsupervised individuals, in contravention of Florida law;

(ii)     the Defendants could not lawfully recover PIP Benefits for the purported physical therapy services, because the services were performed by massage therapists and unlicensed/unsupervised individuals;

(iii)    the Defendants systematically and fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative "physical therapy" services; and

(iv)     the services were performed – to the extent that they were performed at all – in

45

order to increase the amount of PIP benefits that the Defendants could recover from GEICO, not to provide medically necessary care to the Insureds.

**D.      The Defendants' Violations of the False and Fraudulent Insurance Claims Statute**

161.      The Defendants knew that, if they made a legitimate, good-faith effort to collect deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful schemes described herein. For instance, if the Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to the Clinic Defendants' offices for medically unnecessary treatment.

162.      Accordingly, as part and parcel of their fraudulent and unlawful schemes, the Defendants unlawfully engaged in the general business practice of waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

163.      In keeping with this fact, in almost all of the thousands of bills (i.e., HCFA-1500 forms) submitted to GEICO through the Clinic Defendants, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the Insureds.

164.      In the claims identified in Exhibits "1" - "4", the Defendants routinely and falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, the health care services were neither lawfully provided nor reimbursable, because the Defendants operated in violation of the False and Fraudulent Insurance Claims Statute.

**E.      The Defendants' Violations of the Clinic Act**

165.      Because each of the Clinic Defendants was a health care clinic subject to the Clinic Act: (i) Roche could not operate Miracle Health; (ii) Martin and Castillo Martin could not operate Coral Blue; (iii) Llanes could not operate Magic Healing; and (iv) Reyes could not operate Caring With Love, unless they obtained clinic licenses for their respective clinics, and unless the clinics

employed licensed physicians as their respective medical directors, who actually performed the required duties of clinic medical directors.

166. However, if Roche, Llanes, Martin, Castillo Martin and Reyes retained legitimate physicians to serve as the respective Clinic Defendants' medical directors, any such legitimate physicians actually would be obligated to fulfill the statutory and regulatory requirements applicable to clinic medical directors, which would impede the Defendants' fraudulent scheme.

167. Accordingly:

(i) Roche recruited Mendez, Zarate, and Silva, licensed physicians, who were willing to falsely pose as the legitimate medical directors at Miracle Health, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(ii) Martin and Castillo Martin recruited Naim, Zarate, and Sujakumar, licensed physicians, who were willing to falsely pose as the legitimate medical directors at Coral Blue, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic;

(iii) Llanes recruited Naim and Zarate, licensed physicians, who were willing to falsely pose as the legitimate medical director at Magic Healing, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic; and

(iv) Reyes recruited an individual named Gardiner and Zarate, licensed physicians, who were willing to falsely pose as the legitimate medical directors at Caring With Love, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic.

168. Mendez, Zarate, and Silva were never genuine medical directors for Miracle Health.

169. Naim, Zarate, and Sujakumar were never genuine medical directors for Coral Blue.

170. Naim and Zarate were never genuine medical directors for Magic Healing.

171. Gardiner and Zarate were never genuine medical directors for Caring With Love.

172. Instead, from the beginning of each of their associations with the respective Clinic

Defendants, Mendez, Zarate, Silva, Sujakumar, Naim, and Gardiner ceded true decision-making authority regarding health care services at the Clinic Defendants – and the resulting billing – to the Clinic Defendants' owners.

173.   Mendez, Zarate, Silva, Sujakumar, Naim, and Gardiner never legitimately served as medical directors at the respective Clinic Defendants, inasmuch as they: (i) never conducted systematic reviews of the respective Clinic Defendants' billings to ensure that the billings were not fraudulent or unlawful; (ii) never ensured that all treating practitioners at the respective Clinic Defendants were properly licensed; and (iii) never even made any attempt to discover the fraudulent and unlawful charges submitted through the respective Clinic Defendants – much less take any corrective action – and instead permitted the respective Clinic Defendants to operate in the fraudulent and unlawful manner as set forth herein.

174.   In keeping with the fact that Mendez, Zarate, Silva, Sujakumar, Naim, and Gardiner did not legitimately serve as the respective Clinic Defendants' true medical directors, they were only occasionally physically present at the respective Clinic Defendants, if at all, despite the fact that – pursuant to the Clinic Act – no clinic may operate without the day-to-day supervision of a medical director or clinic director.

175.   For example, Magic Healing's November 2022 AHCA clinic licensing application – which was submitted under penalties of perjury – indicated that Naim was only present at the clinic one day per month.

176.   Magic Healing's March 2023 AHCA clinic licensing application likewise indicated that Zarate was only present at the clinic one day per month.

177.   Coral Blue's February 2025 AHCA clinic licensing application indicated that Sujakumar was present at the clinic only one day per week, and – considering that Sujakumar was

employed full time elsewhere during the pertinent period – upon information and belief he was not in fact present at Coral Blue even one day per week.

178. Miracle Health's July 2023 and February 2024 AHCA clinic licensing applications indicated that Zarate was only present at the clinic one day per month.

179. Miracle Health's September 2024 licensing application indicated that Silva was present for only 2-3 days per month, and – considering that Silva was employed full time elsewhere during the pertinent period – upon information and belief she was not in fact present at Miracle Health even 2-3 days per month.

180. Caring With Love's August 2024 AHCA clinic licensing application indicated that Gardiner was only present at the clinic one day per month, and its January 2025 application indicated that Zarate likewise was only present at the clinic one day per month.

181. In the claims identified in Exhibits "1" - "4", the Defendants falsely represented that the Clinic Defendants were in compliance with the Clinic Act and eligible to receive PIP reimbursement.

182. In fact, none of the Clinic Defendants were in compliance with the Clinic Act, and they were not eligible to receive PIP reimbursement.

**III.     The Fraudulent and Unlawful Claims the Defendants Submitted to GEICO**

183. To support their fraudulent charges, the Defendants systematically submitted thousands of bills and treatment reports – containing thousands of individual charges – to GEICO through the respective Clinic Defendants, seeking payment for Fraudulent Services that the Defendants were not entitled to receive.

184. The claims that the Defendants submitted to GEICO were false and misleading in the following material respects:

(i)     The bills and treatment reports submitted by the Defendants misrepresented to GEICO that the Defendants were in compliance with Florida law and were, therefore, eligible to collect PIP Benefits in the first instance, when, in fact, the Defendants were not in compliance with Florida law and were not eligible to collect PIP Benefits in the first instance.

(ii)    The bills and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided, lawfully billed to GEICO, and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided, not lawfully billed to GEICO, and not eligible for PIP reimbursement.

(iii)    The bills and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary, and, in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not legitimately performed at all, and – to the extent that the Fraudulent Services were performed – the Fraudulent Services were not medically necessary and were performed as part of pre-determined fraudulent treatment and billing protocols designed to financially enrich the Defendants, and not to provide medically necessary care to the Insureds who supposedly were subjected to the Fraudulent Services.

(iv)    The bills and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the nature, extent, and results of the Fraudulent Services that purportedly were provided.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

185.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

186.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

187.    For instance, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that the Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

50

188. The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and frequently were never performed in the first instance.

189. The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were oftentimes unlawfully performed by massage therapists and unlicensed/unsupervised individuals and unlawfully billed to GEICO.

190. The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers if the charges were not promptly paid in full.

191. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to – and did – cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $5,000,000.00.

192. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover – and could not reasonably have discovered – that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Miracle Health**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

193. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

194. There is an actual case and controversy between GEICO and Miracle Health regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have

51

been submitted to GEICO.

195.    Miracle Health has no right to receive payment for any pending bills submitted to GEICO because Miracle Health was unlawfully operated in violation of Florida law.

196.    Miracle Health has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

197.    Miracle Health has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

198.    Miracle Health has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

199.    Miracle Health has no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

200.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Miracle Health has no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Roche**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

201.    GEICO incorporates, as though fully set forth herein, each and every allegation in

52

paragraphs 1-192, above.

202. Miracle Health is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

203. Roche has knowingly conducted and/or participated in, directly or indirectly, the conduct of Miracle Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that Miracle Health was not eligible to receive under the No-Fault Law because: (i) Miracle Health was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

204. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "1".

205. Miracle Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Roche operated Miracle Health, inasmuch as Miracle Health was not

engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Miracle Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Miracle Health continues to attempt collection on the fraudulent billing submitted through Miracle Health to the present day.

206.    Miracle Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Miracle Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

207.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $622,000.00 pursuant to the fraudulent bills submitted through the Miracle Health enterprise.

208.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## THIRD CAUSE OF ACTION
### Against Roche, Mendez, Silva, and Zarate
### (Violation of RICO, 18 U.S.C. § 1962(d))

209.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

210.    Miracle Health is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

211.    Roche, Mendez, Silva and Zarate were employed by – or associated with – the Miracle Health enterprise.

54

212. Roche, Mendez, Silva, and Zarate knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Miracle Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that Miracle Health was not eligible to receive under the No-Fault Law because: (i) Miracle Health was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

213. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

214. Roche, Mendez, Silva, and Zarate knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

215. GEICO has been injured in its business and property by reason of the above-

55

described conduct in that it has paid at least $622,000.00 pursuant to the fraudulent bills submitted through the Miracle Health enterprise.

216. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**FOURTH CAUSE OF ACTION**
**Against Miracle Health, Roche, Mendez, Silva and Zarate**
**(Under Fla. Stat. §§ 501.201 et seq.)**

217. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

218. Miracle Health, Roche, Mendez, Silva, and Zarate are actively engaged in trade and commerce in the State of Florida.

219. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

220. Miracle Health, Roche, Mendez, Silva, and Zarate engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

221. The bills and supporting documents submitted to GEICO by Miracle Health, Roche, Mendez, Silva, and Zarate were fraudulent in that they misrepresented: (i) Miracle Health's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

222. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Miracle Health, Roche, Mendez, Silva, and Zarate has been materially injurious to GEICO and its Insureds.

56

223.    The conduct of Miracle Health, Roche, Mendez, Silva, and Zarate was the actual and proximate cause of the damages sustained by GEICO.

224.    Miracle Health, Roche, Mendez, Silva, and Zarate's unfair and deceptive acts have caused GEICO to sustain damages of at least $622,000.00.

225.    By reason of Miracle Health, Roche, Mendez, Silva, and Zarate's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## FIFTH CAUSE OF ACTION
### Against Miracle Health, Roche, Mendez, Silva and Zarate
### (Common Law Fraud)

226.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

227.    Miracle Health, Roche, Mendez, Silva, and Zarate intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through Miracle Health for the Fraudulent Services.

228.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Miracle Health was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

57

229.     Miracle Health, Roche, Mendez, Silva, and Zarate intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Miracle Health that were not reimbursable.

230.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $622,000.00 pursuant to the fraudulent bills that were submitted by Miracle Health, Roche, Mendez, Silva, and Zarate through Miracle Health.

231.     Miracle Health, Roche, Mendez, Silva, and Zarate's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

232.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

### SIXTH CAUSE OF ACTION
**Against Miracle Health, Roche, Mendez, Silva and Zarate**
**(Unjust Enrichment)**

233.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

234.     As set forth above, Miracle Health, Roche, Mendez, Silva, and Zarate have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

235.     When GEICO paid the bills and charges submitted by Miracle Health, Roche, Mendez, Silva, and Zarate through Miracle Health, it reasonably believed that it was legally obligated to make such payments based on Miracle Health, Roche, Mendez, Silva and Zarate's

58

improper, unlawful, and/or unjust acts.

236.    Miracle Health, Roche, Mendez, Silva, and Zarate have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Miracle Health, Roche, Mendez, Silva, and Zarate voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

237.    Miracle Health, Roche, Mendez, Silva, and Zarate's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

238.    By reason of the above, Miracle Health, Roche, Mendez, Silva, and Zarate have been unjustly enriched in an amount to be determined at trial, but in no event less than $622,000.00.

**SEVENTH CAUSE OF ACTION**
**Against Caring With Love**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

239.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

240.    There is an actual case and controversy between GEICO and Caring With Love regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

241.    Caring With Love has no right to receive payment for any pending bills submitted to GEICO because Caring With Love was unlawfully operated in violation of Florida law.

242.    Caring With Love has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

243.    Caring With Love has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were

59

provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

244. Caring With Love has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

245. Caring With Love has no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

246. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Caring With Love has no right to receive payment for any pending bills submitted to GEICO.

### EIGHTH CAUSE OF ACTION
**Against Reyes**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

247. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

248. Caring With Love is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

249. Reyes has knowingly conducted and/or participated in, directly or indirectly, the conduct of Caring With Love's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five

years seeking payments that Caring With Love was not eligible to receive under the No-Fault Law because: (i) Caring With Love was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

250. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "4".

251. Caring With Love's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Reyes operated Caring With Love, inasmuch as Caring With Love was not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Caring With Love to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Caring With Love continues to attempt collection on the fraudulent billing submitted through Caring With Love to the present day.

252. Caring With Love is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.

These inherently unlawful acts are taken by Caring With Love in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

253.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,949,000.00 pursuant to the fraudulent bills submitted through the Caring With Love enterprise.

254.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**NINTH CAUSE OF ACTION**
**Against Reyes and Zarate**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

255.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

256.    Caring With Love is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

257.    Reyes and Zarate were employed by – or associated with – the Caring With Love enterprise.

258.    Re Reyes and Zarate knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Caring With Love's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that Caring With Love was not eligible to receive under the No-Fault Law because: (i) Caring With Love was unlawfully operated

62

in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

259.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

260.    Reyes and Zarate knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

261.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,949,000.00 pursuant to the fraudulent bills submitted through the Caring With Love enterprise.

262.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

63

**TENTH CAUSE OF ACTION**
**Against Caring With Love, Reyes, and Zarate**
**(Under Fla. Stat. §§ 501.201 et seq.)**

263. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

264. Caring With Love, Reyes, and Zarate are actively engaged in trade and commerce in the State of Florida.

265. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

266. Caring With Love, Reyes, and Zarate engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

267. The bills and supporting documents submitted to GEICO by Caring With Love, Reyes, and Zarate were fraudulent in that they misrepresented: (i) Caring with Love's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

268. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Caring With Love, Reyes, and Zarate has been materially injurious to GEICO and its Insureds.

269. The conduct of Caring With Love, Reyes, and Zarate was the actual and proximate cause of the damages sustained by GEICO.

270. Caring With Love, Reyes, and Zarate's unfair and deceptive acts have caused GEICO to sustain damages of at least $3,949,000.00

271. By reason of Caring With Love, Reyes, and Zarate's conduct, GEICO is also

64

entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## ELEVENTH CAUSE OF ACTION
### Against Caring With Love, Reyes, and Zarate
### (Common Law Fraud)

272.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

273.     Caring With Love, Reyes, and Zarate intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through Caring With Love for the Fraudulent Services.

274.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Caring With Love was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

275.     Caring With Love, Reyes, and Zarate intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Caring With Love that were not reimbursable.

276.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

65

reason of the above-described conduct in that it has paid at least $3,949,000.00 pursuant to the fraudulent bills that were submitted by Caring With Love, Reyes, and Zarate through Caring With Love.

277. Caring With Love, Reyes, and Zarate's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

278. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**TWELFTH CAUSE OF ACTION**
**Against Caring With Love, Reyes, and Zarate**
**(Unjust Enrichment)**

279. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

280. As set forth above, Caring With Love, Reyes, and Zarate have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

281. When GEICO paid the bills and charges submitted by Caring With Love, Reyes, and Zarate through Caring With Love, it reasonably believed that it was legally obligated to make such payments based on Caring With Love, Reyes, and Zarate's improper, unlawful, and/or unjust acts.

282. Caring With Love, Reyes, and Zarate have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit Caring With Love, Reyes, and Zarate voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

283. Caring With Love, Reyes, and Zarate's retention of GEICO's payments violates

66

fundamental principles of justice, equity, and good conscience.

284. By reason of the above, Caring With Love, Reyes, and Zarate have been unjustly enriched in an amount to be determined at trial, but in no event less than $3,949,000.00.

## THIRTEENTH CAUSE OF ACTION
### Against Magic Healing
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

285. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

286. There is an actual case and controversy between GEICO and Magic Healing regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

287. Magic Healing has no right to receive payment for any pending bills submitted to GEICO because Magic Healing was unlawfully operated in violation of Florida law.

288. Magic Healing has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

289. Magic Healing has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

290. Magic Healing has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

291. Magic Healing has no right to receive payment for any pending bills submitted to

67

GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

292. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Magic Healing has no right to receive payment for any pending bills submitted to GEICO.

### FOURTEENTH CAUSE OF ACTION
#### Against Llanes
#### (Violation of RICO, 18 U.S.C. § 1962(c))

293. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

294. Magic Healing is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

295. Llanes knowingly conducted and/or participated in, directly or indirectly, the conduct of Magic Healing's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over two years seeking payments that Magic Healing was not eligible to receive under the No-Fault Law because: (i) Magic Healing was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were

never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

296. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "3".

297. Magic Healing's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Llanes operated Magic Healing, inasmuch as Magic Healing was not engaged in a legitimate health care practice and acts of mail fraud were, therefore, essential in order for Magic Healing to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Magic Healing continues to attempt collection on the fraudulent billing submitted through Magic Healing to the present day.

298. Magic Healing is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Magic Healing in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

299. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $261,000.00 pursuant to the fraudulent bills submitted through Magic Healing.

300. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this

Court deems just, proper, and equitable.

## FIFTEENTH CAUSE OF ACTION
### Against Llanes, Naim, and Zarate
### (Violation of RICO, 18 U.S.C. § 1962(d))

301.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

302.    Magic Healing is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

303.    Llanes, Naim, and Zarate were employed by – or associated with – the Magic Healing enterprise.

304.    Llanes, Naim, and Zarate knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Magic Healing's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over two years seeking payments that Magic Healing was not eligible to receive under the No-Fault Law because: (i) Magic Healing was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

70

305. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

306. Llanes, Naim, and Zarate knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

307. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $261,000.00 pursuant to the fraudulent bills submitted through the Magic Healing enterprise.

308. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

**SIXTEENTH CAUSE OF ACTION**
**Against Magic Healing, Llanes, Naim, and Zarate**
**(Under Fla. Stat. §§ 501.201 et seq.)**

309. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

310. Magic Healing, Llanes, Naim, and Zarate are actively engaged in trade and commerce in the State of Florida.

311. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

312. Magic Healing, Llanes, Naim, and Zarate engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

313.     The bills and supporting documents submitted to GEICO by Magic Healing, Llanes, Naim, and Zarate were fraudulent in that they misrepresented: (i) Magic Healing's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

314.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Magic Healing, Llanes, Naim, and Zarate has been materially injurious to GEICO and its Insureds.

315.     The conduct of Magic Healing, Llanes, Naim, and Zarate was the actual and proximate cause of the damages sustained by GEICO.

316.     Magic Healing, Llanes, Naim, and Zarate's unfair and deceptive acts have caused GEICO to sustain damages of at least $261,000.00.

317.     By reason of Magic Healing, Llanes, Naim, and Zarate's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**SEVENTEENTH CAUSE OF ACTION**
**Against Magic Healing, Llanes, Naim, and Zarate**
**(Common Law Fraud)**

318.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

319.     Magic Healing, Llanes, Naim, and Zarate intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through Magic Healing for the Fraudulent Services.

320.     The false and fraudulent statements of material fact and acts of fraudulent

72

concealment include: (i) in every claim, the representation that Magic Healing was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

321.    Magic Healing, Llanes, Naim, and Zarate intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Magic Healing that were not reimbursable.

322.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $261,000.00 pursuant to the fraudulent bills that were submitted by Magic Healing, Llanes, Naim, and Zarate through Magic Healing.

323.    Magic Healing, Llanes, Naim, and Zarate's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

324.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## EIGHTEENTH CAUSE OF ACTION
### Against Magic Healing, Llanes, Naim, and Zarate
### (Unjust Enrichment)

325.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

326.     As set forth above, Magic Healing, Llanes, Naim, and Zarate have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

327.     When GEICO paid the bills and charges submitted by Magic Healing, Llanes, Naim, and Zarate through Magic Healing, it reasonably believed that it was legally obligated to make such payments based on Magic Healing, Llanes, Naim, and Zarate's improper, unlawful, and/or unjust acts.

328.     Magic Healing, Llanes, Naim, and Zarate have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Magic Healing, Llanes, Naim, and Zarate voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

329.     Magic Healing, Llanes, Naim, and Zarate's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

330.     By reason of the above, Magic Healing, Llanes, Naim, and Zarate have been unjustly enriched in an amount to be determined at trial, but in no event less than $261,000.00.

## NINETEENTH CAUSE OF ACTION
### Against Coral Blue
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

331.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

332.     There is an actual case and controversy between GEICO and Coral Blue regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been

submitted to GEICO.

333. Coral Blue has no right to receive payment for any pending bills submitted to GEICO because Coral Blue was unlawfully operated in violation of Florida law.

334. Coral Blue has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

335. Coral Blue has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

336. Coral Blue has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

337. Coral Blue has no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

338. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Coral Blue has no right to receive payment for any pending bills submitted to GEICO.

**TWENTIETH CAUSE OF ACTION**
**Against Martin and Castillo Martin**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

339. GEICO incorporates, as though fully set forth herein, each and every allegation in

75

paragraphs 1-192, above.

340.   Coral Blue is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

341.   Martin and Castillo Martin have knowingly conducted and/or participated in, directly or indirectly, the conduct of Coral Blue's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that Coral Blue was not eligible to receive under the No-Fault Law because: (i) Coral Blue was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

342.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "2".

343.   Coral Blue's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Martin and Castillo Martin operated Coral Blue, inasmuch as Coral Blue was

76

not engaged in legitimate health care practice and acts of mail fraud were, therefore, essential in order for Coral Blue to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Coral Blue, Martin, and Castillo Martin continue to attempt collection on the fraudulent billing submitted through Coral Blue to the present day.

344. Coral Blue is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Coral Blue in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

345. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $200,000.00 pursuant to the fraudulent bills submitted through the Coral Blue enterprise.

346. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-FIRST CAUSE OF ACTION
**Against Martin, Castillo Martin, Naim, Zarate, and Sujakumar**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

347. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

348. Coral Blue is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

349. Martin, Castillo Martin, Naim, Zarate, and Sujakumar were employed by – or associated with – the Coral Blue enterprise.

350. Martin, Castillo Martin, Naim, Zarate, and Sujakumar knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Coral Blue's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent charges on a continuous basis for over five years seeking payments that Coral Blue was not eligible to receive under the No-Fault Law because: (i) Coral Blue was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

351. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

352. Martin, Castillo Martin, Naim, Zarate, and Sujakumar knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

353. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $200,000.00 pursuant to the fraudulent bills submitted through the Coral Blue enterprise.

354. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-SECOND CAUSE OF ACTION
### Against Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar
### (Under Fla. Stat. §§ 501.201 et seq.)

355. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

356. Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar are actively engaged in trade and commerce in the State of Florida.

357. GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

358. Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

359. The bills and supporting documents submitted to GEICO by Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar were fraudulent in that they misrepresented: (i) Coral Blue's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services were actually performed in the first instance.

360. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Coral Blue, Martin, Castillo Martin, Naim, Zarate,

79

and Sujakumar has been materially injurious to GEICO and its Insureds.

361.  The conduct of Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar was the actual and proximate cause of the damages sustained by GEICO.

362.  Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar's unfair and deceptive acts have caused GEICO to sustain damages of at least $200,000.00.

363.  By reason of Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

**TWENTY-THIRD CAUSE OF ACTION**
**Against Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar**
**(Common Law Fraud)**

364.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

365.  Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through Coral Blue for the Fraudulent Services.

366.  The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Coral Blue was in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, the Fraudulent Services were not lawfully provided and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in

many claims, the representation that the Fraudulent Services were actually performed, when, in many cases, they were not actually performed.

367. Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Coral Blue that were not reimbursable.

368. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $200,000.00 pursuant to the fraudulent bills that were submitted by Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar through Coral Blue.

369. Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

370. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

## TWENTY-FOURTH CAUSE OF ACTION
**Against Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar**
**(Unjust Enrichment)**

371. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-192, above.

372. As set forth above, Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment

81

of GEICO.

373. When GEICO paid the bills and charges submitted by Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar through Coral Blue, it reasonably believed that it was legally obligated to make such payments based on Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar's improper, unlawful, and/or unjust acts.

374. Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

375. Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

376. By reason of the above, Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar have been unjustly enriched in an amount to be determined at trial, but in no event less than $200,000.00.

## JURY DEMAND

377. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgement be entered in their favor:

A. On the First Cause of Action against Miracle Health, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Miracle Health has no right to receive payment for any of the pending bills submitted to GEICO.

B. On the Second Cause of Action against Roche, compensatory damages in favor of

GEICO in an amount to be determined at trial but in excess of $622,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

C.     On the Third Cause of Action against Roche, Mendez, Silva, and Zarate, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $622,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

D.     On the Fourth Cause of Action against Miracle Health, Roche, Mendez, Silva, and Zarate, compensatory damages in an amount to be determined at trial but in excess of $622,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

E.     On the Fifth Cause of Action against Miracle Health, Roche, Mendez, Silva, and Zarate, compensatory damages in an amount to be determined at trial but in excess of $622,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

F.     On the Sixth Cause of Action against Miracle Health, Roche, Mendez, Silva, and Zarate, more than $622,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

G.     On the Seventh Cause of Action against Caring With Love, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Caring With Love has no right to receive payment for any of the pending bills submitted to GEICO.

H.     On the Eighth Cause of Action against Reyes, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,949,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

I.     On the Ninth Cause of Action against Reyes and Zarate, compensatory damages in

83

favor of GEICO in an amount to be determined at trial but in excess of $3,949,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

J.      On the Tenth Cause of Action against Caring With Love, Reyes, and Zarate, compensatory damages in an amount to be determined at trial but in excess of $3,949,000, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

K.      On the Eleventh Cause of Action against Caring With Love, Reyes, and Zarate, compensatory damages in an amount to be determined at trial but in excess of $3,949,000, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

L.      On the Twelfth Cause of Action against Caring With Love, Reyes, and Zarate, more than $3,949,000 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

M.      On the Thirteenth Cause of Action against Magic Healing, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Magic Healing has no right to receive payment for any of the pending bills submitted to GEICO.

N.      On the Fourteenth Cause of Action against Llanes, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $261,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

O.      On the Fifteenth Cause of Action against Llanes, Naim, and Zarate, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $261,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

P.      On the Sixteenth Cause of Action against Magic Healing, Llanes, Naim, and Zarate,

compensatory damages in an amount to be determined at trial but in excess of $261,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

Q.      On the Seventeenth Cause of Action against Magic Healing, Llanes, Naim, and Zarate, compensatory damages in an amount to be determined at trial but in excess of $261,000.00, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

R.      On the Eighteenth Cause of Action against Magic Healing, Llanes, Naim, and Zarate,  more than $261,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

S.      On the Nineteenth Cause of Action against Coral Blue, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Coral Blue has no right to receive payment for any of the pending bills submitted to GEICO.

T.      On the Twentieth Cause of Action against Martin and Castillo Martin, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $200,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

U.      On the Twenty-First Cause of Action against Martin, Castillo Martin, Naim, Zarate, and Sujakumar, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $200,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest.

V.      On the Twenty-Second Cause of Action against Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $200,000.00, together with costs and reasonable attorneys'

85

fees pursuant to Fla. Stat. § 501.211(2).

W.      On the Twenty-Third Cause of Action against Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar, compensatory damages in an amount to be determined at trial but in excess of $200,000.00, together with punitive damages, costs, and interest, along with such other and further relief as this Court deems just, proper, and equitable.

X.      On the Twenty-Fourth Cause of Action against Coral Blue, Martin, Castillo Martin, Naim, Zarate, and Sujakumar, more than $200,000.00 in compensatory damages, plus costs and interest, along with such other and further relief as this Court deems just, proper, and equitable.

Dated: Jacksonville, Florida
         June 25, 2026

/s/ Max Gershenoff
Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)

**RIVKIN RADLER LLP**
Riverplace Tower
1301 Riverplace Blvd.
Suite 1000
Jacksonville, Florida 32207
Phone: (904) 791-8948
Facsimile: (904) 598-6225

-and-

926 RXR Plaza
Uniondale, New York 11556
Phone: (516) 357-3226
Facsimile: (516) 357-3333
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Lindsey.Trowell@rivkin.com
Kristen.Wenger@rivkin.com

*Counsel for Plaintiffs*